1
2
3
4
5
6
7

8      # UNITED STATES DISTRICT COURT

9      # EASTERN DISTRICT OF CALIFORNIA

10     # FRESNO DIVISION

11

| | |
|---|---|
| 12     **CESAR URIBE, CDC #K-12001,** | Civil No.     08CV01285 DMS (NLS) |
| 13 | |
| 14                              **Plaintiff,** | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 15                    **vs.** | |
| 16     **J. McKESSON, *et al.*,** | **(Dkt Nos. 71, 85)** |
| 17 | |
| 18                           **Defendants.** | |

19

20          Plaintiff Cesar Uribe ("Uribe"), a state prisoner incarcerated at California State Prison Corcoran

21     and housed in the Substance Abuse Treatment Facility and State Prison ("SATF"), proceeding *pro se*

22     and *in forma pauperis* with a civil rights complaint pursuant to 42 U.S.C. § 1983, alleges prison officials

23     violated his "state tort and federal constitutional rights to be free from intentional physical injury to his

24     person and retaliation for exercising his right to access to the courts as protected by state tort law and

25     the First Amendment of the United States Constitution."[1]  (Dkt No. 1, 5:3-7.)  He names as Defendants

26     four SATF correctional officers, sued in their individual capacities, and his claims arise from incidents

27     _____

28          [1]  This matter was reassigned for all purposes on November 26, 2008 from the Eastern District of California to the undersigned Visiting Judge in the Southern District of California.  (Dkt No. 6.)

occurring on February 22, 2007.  He seeks declaratory relief and compensatory and punitive damages. Defendants filed a Motion For Summary Judgment ("Motion") on July 23, 2010.[2]  Both the Court and Defendants provided Uribe with notice of the requirements for opposing summary judgment. (Dkt Nos. 71-1, 72.)  Uribe filed a lengthy Opposition (Dkt Nos. 79-86), and Defendants filed a Reply (Dkt No. 88). After careful consideration of the parties' briefing and exhibits in light of controlling legal authority, the Court **GRANTS** the Motion in part and **DENIES** the Motion in part.

## I.      BACKGROUND

Uribe had a February 22, 2007 deadline to mail certain documents from the prison to the courts in a matter separate from this lawsuit.  When he first attempted to present his legal papers in the appropriate office at about 3:00 p.m., Defendant floor officers J. McKesson, Martinez, and Zaragosa told him to come back "after chow."  His legal mail was eventually processed on February 22, but not before the occurrence of three allegedly retaliatory incidents forming the subject matter of this action:  an alleged assault and battery; a cell search allegedly conducted with improper motivation and in a "ransacking" manner; and the allegedly retaliatory confiscation and destruction of permissible personal property removed from Uribe's cell in the course of the search.

Uribe returned to the floor office at about 7:00 p.m. to present his legal mail for processing, as instructed.  He alleges he again tendered the documents to Defendants Martinez, McKesson, and Zaragosa for acceptance and signature, but was met with "contempt, hostility, and disrespect," profanity, and a "refus[al] to process and send out plaintiff's legal mail." (Dkt No. 1, pp. 6, 7:8-10.)  He told defendant McKesson of his court deadline, and McKesson allegedly "lied" and told him he did not have to process out-going legal mail for anyone "because in fact they did not intend to send out/process plaintiff's legal mail." (Id. at 7:12-17.)  While Defendant Zaragosa looked on, McKesson allegedly "told defendant CO Martinez to slam the door in plaintiff's face . . . .  Defendant CO Martinez then intentionally, wrongfully, unlawfully, and violently assaulted and battered plaintiff by nearly hitting

---

[2]  By Order entered August 17, 2010, the Court solicited confidential statements from the parties regarding their assessments as to whether this case would benefit from a settlement proceeding with a magistrate judge under the Prisoner Settlement Program. (Dkt No. 73.) Settlement efforts were made, but were ultimately deemed unsuccessful in October 2010.

[Uribe's] face with the door, putting him in fear, and smashing his foot in between the door and doorway, causing plaintiff physical injury and pain and suffering, while all three defendants laughed at the incident." (Id. at 7:20-25.)

Uribe alleges he "then attempted to step out of the housing unit to go to the Program Office to speak to the Sergeant about his insubordinate officers and their refusal to accept and process his legal mail, but was stopped by defendant CO A. Tuzon, housing unit control tower officer." (Id. at 7:26-5:1.) When he told Officer Tuzon he "needed to talk to the sergeant about the floor officers' refusal to send out his legal mail and their misconduct," Tuzon told him he wasn't going anywhere and closed the exit gate, "and further impeded plaintiff's access to the courts by ordering plaintiff to go back to his cell and lock up." (Id. at 8:3-1.) After Tuzon told the floor officers of "plaintiff's intentions," and after Uribe "further expressed concern about his legal mail meeting the court deadline," those officers called him back to the floor office to take and log his legal mail "as is the established procedure," but not before further disrespecting him. (Id. at 8:7-16.) According to Uribe,

> Defendant J. Mc[K]esson called me back to the office and shouted more profanity. Among other things, he yelled, "Where the fuck did you think you were going, you fucken punk!?; I'll handcuff your fucken stupid ass and escort you over there myself and tell the sergeant you were trying to escape!" I told J. Mc[K]esson that I wanted to be escorted over there, so that way I could at least tell the sergeant about what they were doing. J. Mc[K]esson then told J. Martinez to take my legal mail so they could sign it.

(Dkt No. 81, 6:1-6.)

Uribe alleges the three floor officers "all stood up and followed behind" him as he began walking back to his cell. (Dkt No. 1, 8:16-17.) When he reached his cell, he told his cellmate the floor officers might be coming into the cell. He alleges Defendant McKesson then "shouted 'You best believe I'm coming in there!'" (Id. at 8:17-20; Dkt No. 81, 6:6-11.) Uribe and his cellmate were confined in a shower cage holding area while McKesson and Zaragosa "ransacked plaintiff's cell," with Martinez standing by the shower cage "as if to keep guard," although he "occasionally would walk to and from plaintiff's cell." (Dkt No. 1, 8:21-24.) Uribe describes verbal exchanges with Martinez which he

1   contends substantiate the cell-search was retaliatory.[3]  (Id. at 8:25-9:3.)  When the prisoners were

2   allowed to go back to their cell, Uribe saw McKesson walking away with a plastic bag containing Uribe's

3   property.  McKesson allegedly "yelled, 'That's what you get for telling me to do my job!; you wanted me

4   to do my job and send out your legal mail, well now I'm also doing my job!'"  (Id. at 9:4-8.)  Uribe

5   describes his cell as "left in shambles," with "[a]ll his remaining property. . . on the floor and stepped

6   on."  (Id. at 9:9-10.)  He "also discovered that some of his personal property, such as a pair of shoes,

7   hobby craft materials and tools, and clothes, were taken and destroyed."  (Id. at 9:10-12.)

8        Based on that conduct, Uribe presents a First Amendment federal constitutional claim and

9   pendant state tort law claims in his verified Complaint, alleging:

10           Defendants CO's J. McKesson, Martinez, Zaragosa, and A. Tuzon
             showed disdain and contempt toward plaintiff because he is and made
11           known to them that he is a litigious inmate.  Defendants then attempted
             to dissuade, discourage, and finally intimidate and retaliate against
12           plaintiff for wanting to send out his legal mail to the court.  Defendants'
             assault and battery on plaintiff and their confiscation and destruction of
13           his personal property were solely motivated by their intent to stop
             plaintiff from exercising his right to access to the courts.  Furthermore,
14           beyond these tangible harms, the defendants' actions chilled plaintiff's
             First Amendment rights and did not reasonably advance any penological
15           goals.

16   (Id. at 9:13-22, 10:18-26.)

17        The docket reflects considerable activity associated with discovery issues in this matter,

18   including Uribe's unsuccessful May 2010 Motion For Sanctions for alleged spoliation of evidence arising

19   from the destruction of cell search records, in particular McKesson's February 22, 2007 cell search

20   receipts and the February 2007 cell/locker search log book for the SATF Facility E, Housing Unit #2.

21   (Dkt Nos. 63-64.)  Those records would be relevant to the disputed fact whether McKesson searched

22   more than just Uribe's cell that day.  The loss of those records had been substantiated in connection with

23   Uribe's January 2010 motion to compel further discovery responses from McKesson, who provided a

24   Declaration authenticating the CDCR institutional records retention policy and memorializing his

25   _____

26       [3]  For example, when Uribe responded to a question from Martinez with the answer that he had been
         incarcerated for thirteen years, Martinez allegedly said:  "'And you still haven't figured it out that this is what
27       happens to inmates like you?'  Plaintiff retorted, 'So I can't do any legal work and send out my legal mail?', to
         which CO Martinez stated 'Not if you don't want this to happen' -- meaning the retaliation."  (Dkt No. 1, 8:25-
28       9:2.)

1  determination that the relevant confiscated property receipts and log book had been destroyed in

2  February 2008 and February 2009 respectively in accordance with that policy.[4]  (*See* Dkt No. 89.)

3  In support of their Motion, Defendants argue:  Uribe's federal claim does not amount to a

4  constitutional violation; two of the four named defendants did not personally participate in some or all

5  of the alleged retaliatory conduct and therefore cannot be held liable for any constitutional violation; and

6  the court should decline to exercise supplemental jurisdiction over the state law tort claims or,

7  alternatively, should find them to be time-barred under the California Government Claims Act.  (Dkt

8  No. 71.)  Each Defendant offers his own sworn Declaration in support of the Motion (Dkt Nos. 71-4,

9  71-5, 71-6, and 71-7), and they also collectively rely upon, among other things, Uribe's medical records

10  (Dkt No. 71-8) as proof he received no physical injury, and on the tort claim denial records from the

11  California Government Claims Board (Dkt No. 71-9), which triggered the running of a six-month statute

12  of limitations on his state law causes of action.

13  Uribe filed a comprehensive Opposition to the Motion comprised of Points and Authorities, his

14  Declaration with multiple exhibits, the Declarations of three inmate percipient witnesses, objections to

15  Defendants' evidence with a Motion To Strike (Dkt No. 85), and a response to Defendants' Separate

16  Statement of Undisputed Facts.  (Dkt Nos. 79-86.)  Defendants filed a cursory Reply.  (Dkt No. 88.)

17  **II.    DISCUSSION**

18  **A.    Legal Standards**

19  **1.    Civil Rights Act, 42 U.S.C. § 1983**

20  The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), "'is not itself a source of substantive

21  rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Graham v.

22  Connor, 490 U.S. 386, 393-94 (1989)(citation omitted).  Section 1983 liability "arises only upon a

23  showing of personal participation by the defendant," acting under color of state law, that deprived the

24  plaintiff of a constitutional or federal statutory right.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

25  _____

26  [4] In her October 21, 2010 Order denying Uribe's sanctions motion, the Magistrate Judge found that none of the named Defendants personally participated in or had knowledge of the documents' destruction, nor were

27  they aware Uribe would seek those documents until he requested them in October 2009, after they had already been destroyed.  (Dkt No. 89, pp. 6-8, 8:2-3 ("The Court finds that sanctions are not warranted because the duty

28  to preserve the evidence had not yet arisen and the records were not destroyed with a culpable state of mind.").)

1989).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Federal courts hold a *pro se* litigant's pleadings to "less stringent standards than formal pleadings drafted by lawyers." Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987)(punctuation and citation omitted); *see also* Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(*per curiam*).  However, "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).  Furthermore, the benefit of liberal construction does not entitle prisoners' *pro se* pleadings to receive the benefit of every conceivable doubt, but only the drawing of reasonable factual inferences. McKinney v. De Bord, 507 F.2d 501, 504 (9th Cir. 1974).

## 2.   Prison Litigation Reform Act

The Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e, modified the processing of *pro se* prisoners' civil rights complaints.  The court may now at any time dismiss an action or portions of an action, *sua sponte* or on a party's motion, if the "action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1983e(c); *see also* 28 U.S.C. § 1915.  The PLRA also restricts the availability and extent of remedies prisoners may seek in civil rights actions.  For example, the recovery of compensatory damages for mental or emotional injury suffered while in custody requires "a prior showing of physical injury" that is more than *de minimus*.  42 U.S.C. § 1997e(e)("[n]o federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury"); *see* Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002)(the physical injury "need not be significant" but it "must be more than de minimus"); *see also* Jackson v. Carey, 353 F.3d 750, 758 (9th Cir. 2003); *cf.* Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998)(no such showing applies to allegations of constitutional violations not premised on mental or emotional injury, such as claims arising under the First Amendment, "regardless of the form of relief sought").

The PLRA provides that prisoners must exhaust "such administrative remedies as are available"

before bringing a lawsuit.  42 U.S.C. § 1997e(a).  A failure to exhaust is not jurisdictional, but rather an affirmative defense that defendants must raise and prove.  Although inmates are not required to plead specifically or demonstrate exhaustion in their complaints (*see* Jones v. Bock, 549 U.S. 199, 212-17 (2007)), Uribe alleges exhaustion (*see* Dkt No. 1, p. 2), and Defendants do not dispute that representation.

### 3.    Summary Judgment Standard Of Review

Any claiming or defending party may move, with or without supporting affidavits, for summary judgment on all or part of the claim.  Fed. R. Civ. P. 56(a), (b).  Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(citing Fed. R. Civ. P. 56(c)); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 256 (1986).   "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).  The substantive law defining the elements of the claim controls the materiality of facts.  *See* Anderson, 477 U.S. at 248.  A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  *See* Celotex, 477 U.S. at  323.

The moving party bears the initial "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  In satisfying this burden, the movant is not required to produce evidence negating the non-movant's claims.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885, 888-89 (1990)("the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues").  If the moving party fails to discharge this initial burden, summary judgment must be denied, "even if no opposing evidentiary matter is presented."  Adickes, 398 U.S. at 159-60.

If the movant carries its burden, the burden then shifts to the non-moving party to establish facts beyond the pleadings showing that a genuine issue of disputed material fact makes summary judgment

1   inappropriate. <u>Celotex</u>, 477 U.S. at 324; <u>Adickes</u>, 398 U.S. at 157. The opposing party must "go beyond

2   the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and

3   admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477

4   U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). That party may not rest on conclusory allegations or mere

5   assertions (*see* <u>Taylor</u>, 880 F.2d at 1045), and the "mere existence of a scintilla of evidence in support

6   of the non-moving party's position is not sufficient" to create a genuine issue for trial. <u>Arpin v. Santa</u>

7   <u>Clara Valley Transp. Agency</u>, 261 F.3d 912, 919 (9th Cir. 2001); *see also* <u>Matsushita Elec. Indus. Co.,</u>

8   <u>Ltd. v. Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986); *see also* <u>Bias v. Moynihan</u>, 508 F.3d 1212, 1218

9   (9th Cir. 2007). The opposing party must present probative evidence of specific and material factual

10  issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor

11  of either party." <u>Anderson</u>, 477 U.S. at 249-50, 256 (citation omitted); *see also* <u>Leer v. Murphy</u>, 844

12  F.2d 628, 634 (9th Cir. 1988).

13       The Court accepts the version of facts most favorable to the non-moving party in ruling on a

14  motion for summary judgment. <u>Anderson</u>, 477 U.S. at 255. The Court does not make credibility

15  determinations, weigh conflicting evidence, or draw its own inferences, as those are functions reserved

16  for the trier of fact. <u>Id.</u> at 249, 255, 249 (the district court's role on summary judgment is merely to

17  determine whether there is a genuine issue for trial). "[W]here the [material] facts specifically averred

18  by [the opposing] party contradict facts specifically averred by the movant, the motion must be denied."

19  <u>Lujan</u>, 497 U.S. at 888. Considering the evidence from both sides, "[i]f reasonable minds could differ"

20  and there is "evidence on which the jury could reasonably find for the [non-moving] party," summary

21  judgment for the moving party is also improper. <u>Anderson</u>, 477 U.S. at 252. Conversely, summary

22  judgment must be entered for the moving party "if, under the governing law, there can be but one

23  reasonable conclusion as to the verdict." <u>Id.</u> at 250-251; <u>Celotex</u>, 477 U.S. at 325; *see* <u>San Diego Police</u>

24  <u>Officers' Ass'n v. San Diego City Emps. Ret. Sys.</u>, 568 F.3d 725, 733 (9th Cir. 2009)(a "moving party

25  is entitled to judgment as a matter of law" when, viewing the evidence "in the light most favorable to

26  the non-moving party, there are no genuine issues of material fact").

27       **B.**     **Plaintiff's Request For Judicial Notice**

28       As part of his Opposition to Defendants' Motion, Uribe asks the Court to take judicial notice of

8

1   fourteen items, pursuant to Federal Rule of Evidence 201 ("Rule 201").  (Dkt No. 80.)  Rule 201 allows

2   the Court to consider facts "capable of accurate and ready determination by resort to sources whose

3   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The rule "governs only judicial

4   notice of *adjudicative facts*."  Fed. R. Evid. 201(a)(emphasis added).

5          All but two of the items Uribe lists in his Request For Judicial Notice are whole documents filed

6   in this action and entered in the case docket, provisions of the California Code of Regulations, or federal

7   rules of court.  None qualifies as an "adjudicative fact" within the scope of Rule 201.  Codified matters

8   constitute legislative facts that may be judicially noticed without obtaining special leave.  The other two

9   items Uribe requests the Court to take judicial notice of are a portion of the December 2008 *Prison Legal*

10  *News* publication (provided as Exhibit B to Dkt No. 80) and a 1995 Eastern District civil rights case.

11  The Court finds both documents immaterial to the resolution of this Motion and denies Uribe's request

12  for judicial notice.

13          **C.      Plaintiff's Supplemental State Law Claims Are Dismissed As Time-Barred**

14          Defendants do not challenge the timeliness of Uribe's constitutional claim alleging retaliatory

15  conduct in violation of his First Amendment rights.  However, in addition to his federal claim, Uribe

16  alleges Defendants McKesson and Martinez used unlawful force and assaulted him in the alleged door-

17  slamming incident, while defendant "Zaragosa laughed," in violation of his rights under the California

18  Civil Code and California tort law.[5]  (Dkt No. 1, 10:10-15.)  Defendants argue, should the Court grant

19  their Motion as to Uribe's federal constitutional claim, it should "decline to exercise supplemental

20  jurisdiction over Plaintiff[']s pendant state law claims pursuant to 28 U.S.C. § 1367(c)(3)."  (Dkt No.

21  71-2, 2:8-11.)  However, for the reasons discussed below, the Court finds triable issues of material fact

22  preclude summary adjudication of Plaintiff's federal claim.

23  _____

24          [5]  In its entirety, the Complaint alleges as Uribe's "State Claim For Relief:" "Defendants CO J. Mckesson
    and CO Martinez wilfully, intentionally, and unlawfully used unnecessary force and assaulted and battered
25  plaintiff by placing him in apprehension of injury to his face and by smashing his foot with the door and door
    way, causing extreme pain and emotional distress, as CO Zaragosa laughed, in violation of California Civil Code
26  §§ 25, 27, 43, 1708 and California state tort judicial law."  (Dkt No. 1, 10:9-15.)  However, his Government
    Claims Form also included the additional allegations advanced in this lawsuit that after they allegedly "slammed
27  the door on [his] foot and smashed it between the door and the doorway," Defendants "then proceeded to
    maliciously ran sack my cell and left it in shambles in retaliation." (Dkt No. 71-9, p. 7.) Consequently, any state
28  law theories of recovery for that additional conduct are also time-barred for the same reasons.

1    Alternatively, Defendants argue Uribe's supplemental state tort claims must be dismissed because

2    they "are time-barred by the California Government Act."  (Dkt No. 71-2, 2:8-11); *see* Cal. Gov. Code

3    § 945.6(a)(1)("any suit brought against a public entity on a cause of action for which a claim is required

4    to be presented in accordance with [the Tort Claims Act] must be commenced:  (1) If written notice is

5    given in accordance with Section 913, not later than six months after the date such notice is personally

6    delivered or deposited in the mail.").  Injured parties in California seeking to sue a public entity or public

7    employees for damages must first comply with the Government Tort Claims provisions of the state

8    statutes and must present a timely written claim for damages to the entity.  Cal. Gov. Code § 911.2;

9    California v. Superior Court (Bodde), 32 Cal.4th 1234, 1239 (2004).  There is no dispute Uribe timely

10   filed a written claim for damages with the Government Claims Board.  (Dkt No. 71-9, p. 6); Shirk v.

11   Vista Unified School Dist., 42 Cal.4th 201, 208-09 (2007)("Accrual of a cause for purposes of the

12   government claims statute is the date of accrual that would pertain under the statute of limitations

13   applicable to a dispute between private litigants.").  The Board rejected Uribe's claim and notified him

14   of that action by letter dated December 19, 2007.  (Dkt No. 71-9, p. 5; Dkt No. 1, 10:2-4.)  The Board's

15   written notice cites Government Code Section 945.6 and expressly states "You have only six months

16   from the date this notice was personally delivered or deposited in the mail to file a court action on this

17   claim."  (Dkt No. 71-9, p. 5.)

18        In contrast to the two-year limitations period applicable to the presentation of a government tort

19   claim, subsequent lawsuits arising from the same conduct "against a public entity or public employees

20   are governed by the specific statute of limitations provided in the Government Code, not the statute of

21   limitations that applies to private defendants."  Moore v. Twomey, 120 Cal. App. 4th 910, 913 (2004);

22   Martell v. Antelope Valley Hosp. Med. Ctr., 67 Cal. App. 4th 978, 981 (1998).  "Government Code

23   section 945.6 requires 'any suit brought against a public entity' to be commenced no more than six

24   months after the public entity rejects the claim."  Moore, 120 Cal. App. 4th at 914, (quoting Cal. Gov.

25   Code § 945.6(a)(1)).  A civil action is "commenced" by filing a Complaint with the court.  Cal. Code

26   Civ. P. § 352.1(b); Fed. R. Civ. P. 3.  Uribe filed his Complaint on August 29, 2008–"a little over two

27   months late" under California Government Code § 945.6(a)(1).  (Dkt No. 71-2, 12:17-21.)  While

28   acknowledging his statute of limitations problem with respect to the state law claims in his Complaint,

1   Uribe argues Defendants waived that defense, the six-month deadline should be equitably tolled, or

2   Defendants should be estopped from asserting it at this late date.

3       "Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's

4   answer or in an amendment thereto." Day v. McDonough, 547 U.S. 198, 202, 205 (2006)(citing, *inter*

5   *alia*, Fed. R. Civ. P. 8(c)(1)("In responding to a pleading, a party must affirmatively state any avoidance

6   or affirmative defense, including: . . . statute of limitations. . . .")).  Defendants can waive a statute of

7   limitations defense, and, if they do, a court is not precluded from reaching the merits of an untimely

8   claim.  Uribe argues Defendants waived the statute of limitations defense through their "failure to assert

9   it as an affirmative defense" in either of their Answers filed in this action.[6]  (Dkt No. 85, 2:11-13.)  He

10  relies on Rule 8(c) for the proposition:  "If not asserted in a responsive pleading, the affirmative defense

11  is waived, and evidence of such defense is inadmissible at trial."  (Id. at 2:23-26 (citing, *inter alia,*

12  Arizona v. California, 530 U.S. 392, 410 (2000), Jones v. Bock, 549 U.S. 199, 212 (2007)).)

13      Uribe further argues Defendants' "failure to assert the defense did in fact prejudice plaintiff by

14  unfairly surprising him and denying him the opportunity to conduct any discovery to rebut and controvert

15  that argument, where plaintiff was ready to file his lawsuit within the required six-month limitation and

16  in a timely manner but was prevented from doing so by prison officials, which leaves plaintiff with an

17  equitable estoppel defense, among other things, that he could have justified with proper evidence

18  obtained through discovery had he known this affirmative defense would be relied on."  (Dkt No. 85,

19  2:14-20.)  He declares he was "ready to submit my federal lawsuit" on May 28, 2008, but could not pay

20  the filing fee, and prison officials "failed to provide me with the certified copy" of his Inmate Trust

21  Account balance statement to support his *in forma paurperis* request, causing him to miss his June 19,

22  2008 filing deadline.[7]  (Dkt No. 81, ¶¶ 14-17.)  Nevertheless, neither a waiver nor an estoppel argument

23  _____

24      [6]   Defendants McKesson, Zaragosa, and Tuzon filed an Answer to the Complaint in April 2009.  (Dkt
    No. 15.)  Defendant Martinez filed a separate Answer in May 2009.  (Dkt No. 19.)

25

26      [7]  Uribe further asserts the institution has an alleged "practice or custom of failing to provide inmates
    certified copies of their trust account statements" (Dkt No. 81, ¶ 19), and offers evidence and argument in support
    of that contention (Dkt No. 79, pp. 7-11).  However, those allegations are beyond the scope of the claims raised

27  in his Complaint.  In any event, he names no individual against whom he could pursue a Section 1983
    unconstitutional policy or custom theory as he alleges no personal participation by any of the Defendants named

28  here associated with the alleged obstruction of his obtaining a timely certified trust account statement.

1   can relieve him from the untimeliness bar to his judicial pursuit of the state law claims.   Under

2   California Government Code § 945.6(a)(1), the time within which to file a *claim* against a government

3   entity or public employee can be tolled in circumstances where the claimant can show surprise, mistake,

4   or excusable neglect.   However, no such facts can be used to extend the six-month statutory period after

5   rejection of a claim within which a *lawsuit* must be file.  *See* <u>Atchison, Topeka & Santa Fe R.R. Co. v.</u>

6   <u>Stockton Port Dist.</u>, 140 Cal. App. 3d 111, 115-16 (1983); *see also* <u>Martell</u>, 67 Cal. App. 4th at 982

7   ("Where the notice of rejection complies with [the Act's requirements] the six-month statute of

8   limitations *cannot be extended by provisions outside the Tort Claims Act*" and a "number of decisions

9   illustrate the extent to which the Act trumps other statutes")(internal punctuation and citations omitted);

10  *see also* <u>Chase v. California</u>, 67 Cal. App. 3d 808, 812 (1977)(where a statute such as the Tort Claims

11  Act prescribes that "an action against the state 'must be commenced within six months', the requirement

12  is mandatory").   Federal equitable estoppel principles may not be applied to a pendant state claim

13  foreclosed by a state's mandatory limitations period.  *See, e.g.* <u>Ervin v. Los Angeles</u>, 848 F.2d 1018,

14  1019-20 (9th Cir. 1988).   Accordingly, Defendants' Motion for dismissal of Uribe's pendant state law

15  claims as untimely pursuant to California Government Code § 945.6(a)(1) is **GRANTED**.

16          **D.      Evidentiary Objections And Motion To Strike**

17                  **1.      Objection Nos. 1 Through 3**

18          Uribe objects to portions of Defendants' evidence submitted in support of their Motion and

19  moves to strike twenty-one discrete items.  (Dkt No. 85.)  Enumerated objections 1 through 3 address

20  the statute of limitations argument for dismissal of Uribe's supplemental state law tort claims as time-

21  barred under California Government Code § 945.6, rather than challenging any particular fact or item

22  of evidence offered in support of the Motion. (<u>Id.</u> at pp. 1-2.)  The facts associated with Uribe's

23  government tort claims process and the timing of his lawsuit are actually undisputed. (*See* Dkt No. 1,

24  10:2-3; Dkt No. 71-9, p. 5.)  Accordingly, Uribe's Objections to enumerated items 1 through 3 are

25  **OVERRULED** and his Motion To Strike these items is **DENIED**.

26                  **2.      Objection Nos. 4 Through 8**

27          Objection No. 4 targets Defendants' Statement Of Undisputed Facts Nos. 5 and 6  referring to

28  Defendants' representations that, had Uribe's foot been smashed by the door as he alleges, he "would

have been in real pain," and there is "no evidence of Plaintiff crying out, screaming in pain, or going man down as a result of his foot being smashed." (Dkt No. 86, 2:13-19.)  Objections 5 through 8 relate to portions of the McKesson, Zaragosa, Martinez, and Tuzon Declarations describing their observations as percipient witnesses to Uribe's demeanor and apparently uncompromised mobility at the time and after the time he alleges his foot was hit by the door.  (Dkt No. 1, 7:19-25).  Uribe objects to that evidence "on the grounds that it is conclusory, argumentative, and inadmissible opinion by lay witnesses." (Dkt No. 85, 3:13-14.)  He also disputes Defendants' representations he did not show pain, contending elsewhere he cringed and grimaced in response to the incident, but Defendants did not witness his reaction because they were laughing.  He argues their statements and evidentiary proffers should be stricken because they are "conclusory, argumentative, and [supported only by purportedly] inadmissible opinion testimony by lay witnesses." (Id. at 3:5-6, 13-14.)  The Court finds each declarant merely states what he contends he personally witnessed.  Such evidence is admissible, and it is for a trier of fact to make credibility determinations when the parties present conflicting versions of the truth. Accordingly, Uribe's evidentiary objections on the grounds presented are **OVERRULED** and his motion to strike that evidence for purposes of deciding this Motion is **DENIED**.

### 3.    Objection Nos. 9, 10, And 20

Uribe objects to and moves to strike certain statements in Defendants' Memorandum Of Points and Authorities in support of their Motion.  (Dkt No. 85.)  However, points and authorities are, by definition, argument, not evidence to be admitted or stricken.  As Uribe merely disagrees with Defendants' representations construing the facts and legal authority, those Objections are **OVERRULED** and his motion to strike them on evidentiary grounds is **DENIED**.

### 4.    Objection Nos. 11 Through 13

Uribe objects to Defendants' purportedly Undisputed Material Fact No. 17 and Paragraph 16 in both the McKesson Declaration and the Zaragosa Declaration, each of which states that cells 201, 202, and 203 were searched on the evening of February 22, 2007.  Uribe objects to these statements on grounds each is "conclusory, argumentative, and improper."  He notes that at the time he filed his Opposition, his Motion For Sanctions for alleged spoliation of evidence related to cell-search records remained under submission with the Magistrate Judge, and he apparently anticipated some impropriety

1   associated with the destruction of those records would be attributed to the Defendants  As noted above,

2   however, that Motion was denied on grounds the cell-search log and search records for the relevant time

3   period were routinely destroyed in accordance with the institution's record's retention policy, with no

4   improper conduct attributable to these Defendants.   In addition, Uribe's further objection that the

5   statements are "conclusory and argumentative" is without merit.   Both McKesson and Zaragosa were

6   floor officers on duty during the time the incidents giving rise to the litigation occurred and each is

7   alleged to have personally participated in challenged conduct.  Each makes an unequivocal statement

8   of fact under oath, not an argument or conclusion,  of which each appears to have personal knowledge.

9   The Declarations are accordingly competent evidence for purposes of supporting their Motion.  Uribe's

10   Objections merely highlight a disputed issue of fact.  His Objections are **OVERRULED**, and his Motion

11   To Strike those portions of Defendants' evidentiary submissions is **DENIED**.

12                  **5.**    **Objection No. 14**

13        Uribe moves to strike the Martinez Declaration in its entirety on grounds it is "a sham

14   declaration." (Dkt No. 85, 4:26.) He argues the Declaration contradicts Martinez's sworn responses to

15   the interrogatories Uribe propounded to him because Martinez purportedly "evaded responding to

16   approximately 20 interrogatories by responding he did not recall to virtually all interrogatories and

17   effectively circumventing the discovery process." (Id. at 5:7-9.) He argues "the interest of fairness and

18   due process" require that "defendant J. Martinez not now be allowed to declare facts helpful only to him

19   regarding the day in question when it is in complete contradiction to his sworn-to responses to plaintiff's

20   interrogatories that he did not recall anything from the day in question." (Id. at 5:9-12.)  Assuming,

21   *arguendo* and solely for purposes of deciding the summary judgment motion, that a finder of fact could

22   conclude "Defendant J. Martinez's credibility is seriously undermined" by belated recollections and

23   "should be disregarded, discounted, and rejected" (Id. at 5:14-15), as Uribe argues, it is up to the finder

24   of fact to decide what weight if any to give Martinez's testimonial evidence.  Accordingly, Uribe's

25   objection is **OVERRULED** and the motion to strike the Martinez Declaration is **DENIED**, as on its face

26   it shows he has personal knowledge of the facts he states under oath.

27                 **6.**    **Objection Nos. 15 Through 19**

28        Uribe objects to and moves to strike a one-sentence paragraph in each of the McKesson,

Zaragosa, Martinez, and Tuzon Declarations on grounds "defendants' expressed opinions and conclusions have no foundation." (Dkt No. 85, 5:24-25.) The paragraph states in its entirety: "The floor office door in question is heavy duty."  Uribe also objects to Undisputed Material Fact No. 4, which states "[t]he floor office door in question is heavy duty."  That characterization has no bearing on the resolution of Defendants' summary judgment motion.   Accordingly,   Uribe's objections are **OVERRULED** and the motion to strike that evidence is **DENIED** as better left for trial, if the weight of the door ultimately is held to have any bearing at all on any material issue.

### 7. Objection No. 21

Uribe objects to Undisputed Material Fact Nos. 12 and 13 on the basis each is irrelevant.  Uribe's assertion he denies Defendants' Undisputed Fact Nos. 12 and 13, which are related to the contents of his medical records in February and April 2007 (showing he was seen during that period only for eczema and low blood pressure), is not sufficient support for his evidentiary objection arguing his medical records around the time of his alleged foot injury are "irrelevant" and should be excluded on that basis. This evidentiary objection is **OVERRULED** and Uribe's motion to strike this evidence is **DENIED**.

### E.  Material Issues Of Fact Preclude Summary Judgment On The First Amendment Retaliation Claim

The foregoing determinations dispose of all of Uribe's claims other than his First Amendment retaliation claim.  Uribe alleges:

> Defendants CO's J. Mckesson, Martinez, Zaragosa, and A. Tuzon, individually and all of them collectively conspired to chill the effect of plaintiff's exercise of his First Amendment rights by arbitrarily assaulting and battering him and ultimately ran-sacking his cell, confiscating and destroying his personal property because he exercised his First Amendment rights to seek access to the legal process of the courts and beyond these tangible harms, the defendants' actions chilled his exercise of his First Amendment rights and did not reasonably advance a legitimate correctional goal, in violation of the First Amendment of the United States Constitution.

(Dkt No. 1, 10:18-26.)

### 1.  First Amendment Retaliation Legal Standards

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974).  "Of fundamental import to prisoners are their First Amendment 'right[s] to

1  file prison grievances,' [citation], and to 'pursue civil rights litigation in the courts.'" Rhodes v.

2  Robinson, 408 F.3d 559, 567 (9th Cir. 2005)(quoting Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003)

3  *and* Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir. 1995)); *see also* Bradley v. Hall, 64 F.3d 1276,

4  1279 (9th Cir.1995)(prisoners have a constitutional right to meaningful access to the courts, and prison

5  authorities may not penalize or retaliate against an inmate for exercising that right).  Allegations of

6  retaliation against a prisoner for exercising his First Amendment rights to speech, to petition the

7  government, or to file a prison grievance can support a Section 1983 claim. Rizzo v. Dawson, 778 F.2d

8  527, 532 (9th Cir. 1985).  "And because purely retaliatory actions taken against prisoners for having

9  exercised those rights necessarily undermine those protections, such actions violate the Constitution

10  quite apart from any underlying misconduct they are designed to shield." Rhodes, 408 F.3d at 567; *see*

11  Austin v. Terhune, 367 F.3d 1167, 1170-71 (9th Cir. 2004); *see also* Pratt v. Rowland, 65 F.3d 802, 806

12  & n.4, 807 (9th Cir.1995)(retaliation claims "fall within the 'other protection[s] from arbitrary state

13  action' . . . because they are based upon protection of the prisoner's First Amendment rights, and not their

14  Due Process rights").  The prohibition against retaliatory punishment is "clearly established law" in the

15  Ninth Circuit for qualified immunity purposes. Schroeder, 55 F.3d at 461.

16      A valid retaliation claim is comprised of five essential elements: "(1) An assertion that a state

17  actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct,

18  and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action

19  did not advance a legitimate correctional goal." Rhodes, 408 F.3d at 567-68.  A prisoner suing prison

20  officials under Section 1983 for retaliation "must allege that he was retaliated against for exercising his

21  constitutional rights and that the retaliatory action does not advance legitimate penological goals, such

22  as preserving institutional order and discipline." Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir.

23  1994)(*per curiam*).  A variety of conduct can be actionable as retaliatory if undertaken for an improper

24  purpose. *See, e.g.,* Rizzo, 778 F.2d at 531-32 (holding prison officials could not transfer an inmate to

25  another prison in retaliation for the inmate's exercise of his First Amendment right to pursue federal civil

26  rights litigation, regardless of whether inmates have an independent right to be held at any particular

27  prison or in any given type of cell).  The resulting injury need not be tangible to support the claim. Hines

28  v. Gomez, 108 F.3d 265, 267, 269 (9th Cir. 1997)(an injury asserted to be the chilling effect of an

1   officer's false accusation on the prisoner's First Amendment right to file prison grievances is a

2   sufficiently substantial basis on which to found a retaliation claim);

3        In addressing retaliation claims, courts "should 'afford appropriate deference and flexibility' to

4   prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be

5   retaliatory" to avoid  "excessive judicial involvement in day-to-day prison management, which 'often

6   squander[s] judicial resources with little offsetting benefit to anyone.'" Pratt, 65 F.3d at 807 (quoting

7   Sandin, 515 U.S. at 482.)   "[F]ederal courts must remember that the duty to protect inmates'

8   constitutional rights does not confer the power to manage prisons or the capacity to second-guess prison

9   administrators, for which we are ill-equipped." Bruce, 351 F.3d at 1290.

10                    **2.      Defendants' Motion Grounds**

11        To obtain summary judgment on a claim of retaliation, Defendants have the burden to

12   demonstrate that there are no genuine issues of fact supported by evidence as to at least one of the

13   essential elements of a retaliation claim and, as a result, the plaintiff cannot prevail on the claim.

14   Celotex, 477 U.S. at 323.  Defendants claim entitlement to summary judgment as a matter of law

15   "because Plaintiff's federal retaliation claim does not amount to a constitutional violation." (Dkt No.

16   71-2, 2:5-8.) They "deny Plaintiff's claims concerning the alleged assault and battery, cell search, and

17   property confiscation," but despite those disputed material facts, they summarily contend Uribe lacks

18   evidence to support  his allegations because "the record shows there was no assault and battery[;] that

19   the cell search was random, routine, and advanced legitimate correctional goals; and that Plaintiff's

20   property was properly confiscated." (Id. at 3:7-14.)  Defendants rely on Scott v. Harris, 550 U.S. 372,

21   380 (2007) for the proposition "when opposing parties tell two different stories, one of which is blatantly

22   contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

23   version of the facts for purposes of ruling on a motion for summary judgment." (Dkt No. 71-2, 3:8-11.)

24    Defendants thus invite the Court to ignore Uribe's countervailing evidence entirely and to consider the

25   "record" as comprised solely of their own submissions.  The Court declines the invitation and finds the

26   three sworn Declarations submitted by Uribe in support of his Opposition, in addition to his own

27   Declaration (Dkt Nos. 81, 82, 83, and 84), appear to be made on personal knowledge by competent

28   declarants and are entitled to as much consideration for the purpose of deciding this Motion as are the

1    Defendants' own Declarations.

2                    **3.      Standards Applied To Evidentiary Record**

3                         **a.      Protected Activity Element**

4              Defendants acknowledge "[p]risoners have a constitutionally protected right to pursue civil rights

5    litigation without retaliation." (Dkt No. 71-2, 4:12-14 (citing <u>Rhodes</u>, 408 F.3d at 567).)  They further

6    concede, "[t]o the extent that Plaintiff's legal mail was in pursuit of his litigation activity, he was

7    engaged in a protected activity." (Dkt No. 71-2, 4:12-14.)  However, they too-narrowly state Uribe's

8    First Amendment claim in summarizing his allegations.  Uribe alleges Defendants accepted his legal

9    mail only after Officer Tuzon informed them of Uribe's intention.  He further alleges Defendants were

10   motivated in their cell search and property confiscation not only by a desire to retaliate for his

11   persistence in seeking to have his legal mail processed, but also for his attempt to report to their

12   supervising sergeant they were refusing to accept his legal mail.  Viewing the facts in the light most

13   favorable to the non-moving party, Uribe's effort to report the incident may reasonably be construed as

14   an attempt to initiate a grievance.  An inmate's reporting of officer misconduct, or the attempt to do so

15   verbally or in writing, constitutes speech or conduct entitled to First Amendment protection.  In the

16   retaliation context, there is no "legal distinction . . . between the filing of a charge which is clearly

17   protected . . . and threatening to file a charge." <u>Gifford v. Atchison, Topeka, & Santa Fe Ry. Co.</u>, 685

18   F.2d 1149, 1155-56 n.3 (9th Cir. 1982).  The "conduct" which is protected in the context of both the

19   pursuit of litigation and the grievance procedures is the First Amendment right to petition for redress.

20   The Court finds the "protected activity" element of a retaliation claim is essentially undisputed and is

21   supported by the evidentiary record.

22                         **b.      Adverse Action And Injury Elements**

23             Defendants argue the alleged assault and battery, cell search, and property confiscation and

24   destruction do not satisfy the "adverse action" element of a retaliation claim.  They argue summary

25   adjudication of Uribe's First Amendment claim is "appropriate because, as a matter of law, Plaintiff's

26   claimed adverse actions are not of sufficient severity to be considered clearly adverse," resulting in a

27   failure "to demonstrate a triable issue of fact on the essential element of harm." (Dkt No. 71-2, 5:13-15.)

28   They summarize as follows:

                                                    18                    E.D. California 1:08cv1285-DMS(NLS)

> An adverse action is defined as one which would chill or silence a person of ordinary firmness from future First Amendment activities or cause the prisoner to suffer more than minimal harm. *Rhodes*, 408 F.3d at 567-68, n. 11. Plaintiff's cognizable allegations of adverse actions are the alleged assault and battery, cell search, and confiscation and destruction of his property on February 22, 2007. (CR 1 Statement of Claim ¶ 26.) Failing to respond to Plaintiff's demand that his legal mail be immediately processed is not an inherently adverse activity.

(Dkt No. 71-2, 4:16-21.)

Courts apply an objective standard to find a triable issue of fact on this issue.  "[A] plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.'" Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009)(quoting Rhodes, 408 F.3d at 568-69 (to hold otherwise "would be unjust" as it would "allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity")).  Thus, a viable "retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights." Brodheim, 584 F.3d at 1269-70 (quoting Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001)).  "[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." Id. at 1270 (finding a genuine issue of material fact whether the defendant prison official's hand-written warning message to the plaintiff that he should be "careful" about what he writes and requests in his administrative grievances constituted an "adverse action" because it intimated some form of punishment or other adverse action would follow from a failure to comply with the warning); *see also* Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994)("a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures").

With respect to the delay in processing his legal mail action–a claim based upon allegations Defendant McKesson told Uribe they did not have to accept his legal mail–Defendants represent "Plaintiff demanded that his legal mail be immediately processed; that Plaintiff's legal mail was not immediately processed because it was not time for legal mail; and that Plaintiff's legal mail was eventually processed on February 22, 2007." (Dkt No. 71-2, 4:22-25 (citations to Undisputed Facts document omitted).)  However, the gravamen of Uribe's retaliation claim is not that his legal mail was

rejected to his judicial detriment, but rather that he suffered threats and adverse punitive responses from Defendants for his attempts to exercise his First Amendment rights to have that mail accepted for processing.  Moreover, the Court notes in passing that Defendants' representation "it was not time for legal mail" when Uribe first presented himself at the office at 3:00 p.m. is actually a disputed fact, with Uribe declaring "there is no set time for sending out legal mail," Defendants McKesson, Martinez, and Zaragosa were in the office talking with the door closed, and, as substantiated in Defendant Martinez's interrogatory responses, inmates are allowed to knock at the office door.  (Dkt No. 81, Exh. G, p. 68.)  Uribe further disputes Defendants' representation he "demanded" that his legal mail "be immediately processed."  (Uribe Decl., Dkt No. 81, ¶ 4.)

In addition, Defendants purport to support  their arguments with cases which in fact support a conclusion opposite to that for which they are offered.  For example, Defendants cite <u>Rhodes</u>, 408 F.3d 559.  (Dkt No. 71-2, 5:3-6.)

> In *Rhodes* itself, we made this clear [*i.e.*, that assertion of an injury no more tangible than a chilling effect on First Amendment rights can sustain a retaliation claim] by noting that an allegation that a person of ordinary firmness would have been chilled is sufficient to state a retaliation claim, and that, "since harm that is more than minimal will almost always have a chilling effect[, a]lleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety.

<u>Brodheim</u>, 584 F.3d at 1270, 1271 ("The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat").

Uribe expressly alleges both actual and threatened harm.  He alleges actual harm in the form of an assault and battery with the door associated with the rejection of his second tender of legal mail for processing, Defendants' acceptance of his legal papers on his third attempt to present them only after Uribe manifested his intent to complain about the officers' conduct to their sergeant, and a cell search and personal property confiscation immediately following these incidents.  He alleges threatened harm in the form, among others, of allegations Defendant McKesson told him the cell search and property confiscation were what Uribe could expect for telling him how to do his job, and a threat to escort him to the sergeant's office in handcuffs to report Uribe was trying to escape.  Uribe supports those allegations with his own Declaration and those of three other inmate witnesses, including one who states

1    he decided not to file his own legal mail after witnessing what happened to Uribe.  (Solano Decl., Dkt

2    No. 84, 3:21-23 ("After watching all this transpire, I chose not to send out my legal mail because I feared

3    I would be subjected to the same retal[]iation, intimidation, and disrespect that plaintiff was subjected

4    to.").)

5        On the alleged assault and battery adverse action issue, Defendants dispute that Martinez

6    slammed the office door on Uribe's foot and "den[y] causing him any physical injury, pain, or suffering,"

7    contrary to Uribe's Complaint allegations.  They contend they are entitled to summary judgment with

8    respect to that alleged conduct "because no reasonable juror could find that Plaintiff actually suffered

9    an assault and battery."  (Dkt No. 71-2, 5:18-23.)  However, Uribe supports his Complaint allegations

10   not only with his own Declaration, but also with the sworn Declarations of inmates Victor Solano and

11   Carlos Quiroz.  They declare, respectively, they saw Martinez "attempt to slam the door in plaintiff's face

12   but caught his foot first" (Dkt No. 84, 3:1-6) and saw him "quickly tr[y] to slam the door closed while

13   Uribe was still in the door way," seeing "Uribe move back with his upper body but his right leg or foot

14   was hit by the door." (Dkt No. 82, 2:12-15.)  In addition, Uribe's cellmate, Fernando Monges, declares

15   he saw Uribe massage his right foot after the cell search was over, saw the skin behind his big toe was

16   red, and was told by Uribe that officer Martinez had slammed the door on it.  (Dkt No. 83, 3:12-16.)  In

17   their Reply to Uribe's Opposition, Defendants doggedly insist "the record shows that there was no assault

18   and battery" without addressing Uribe's evidence.  (Dkt No. 88, 2:13.)  They merely repeat the general

19   proposition, inapplicable to the state of the record on this issue, "[w]hen opposing parties tell two

20   different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

21   believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for

22   summary judgment," again citing Scott, 550 U.S. at 380.  (Id. at 2:10-13.)  The Court must consider the

23   evidence presented by both sides to determine whether it creates a genuine issue for trial.  Anderson, 477

24   U.S. at 255.  Viewing all the evidence presented, and construing the facts in the light most favorable to

25   the non-moving party, the Court finds a trier of fact must resolve the assault and battery question.

26       On the allegedly retaliatory cell search adverse action issue, Defendants represent it "was a

27   permissible routine and random search that was not clearly adverse to Plaintiff."  (Dkt No. 71-2, 6:19-

28   20.)  There can be no dispute that routine cell searches conducted for the purpose of preserving

21

institutional order, discipline, and security further those legitimate penological goals.  *See* Hudson v.
Palmer, 468 U.S. 517, 529 (1984)("Random searches of inmates, individually or collectively, and their
cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates
and all others within its boundaries").  In reliance on Hudson, Defendants summarily contend "no
reasonable juror could find that the routine and random search of Plaintiff's cell on February 22, 2007,
was clearly adverse to him."  (Dkt No. 71-2, 6:19-7:4, 9:2-28; *see also* Reply, Dkt No. 88, 2:26-3:4.)
However, their argument subsumes the ultimate adjudicative (and disputed) fact that the search at issue
actually was "routine and random" rather than in retaliation for Uribe's exercise of a constitutional right.
Uribe offers both circumstantial and direct evidence from which a reasonable trier of fact could conclude
Defendants were reacting punitively to his repeated attempts to deliver legal mail and his expressed
desire to speak with their supervising sergeant about their obstruction of his attempts to have his legal
mail processed.  He declares Defendants immediately rose to follow him away from the prison office
to his cell after finally accepting his legal mail following two prior rejections.  A disputed issue of fact
also exists as to whether Uribe's was the only cell searched on that date.  Uribe claims so, McKesson
"thinks" he searched four or more cells (Dkt No. 81, Exh. H, p. 79), and the log record of cell searches
for the relevant period of time is unavailable.

Moreover, the resolution of disputed issues of material fact regarding the manner and duration
of the search and the alleged personal property confiscation and destruction will likely inform the
determination whether the search was retaliatory.  Defendants posit, as if it were undisputed, the ultimate
adjudicative fact that the Uribe cell search that night was routine and random and conducted solely for
"contraband and disallowed items."  (Dkt No. 71-2, 7:6-10.)  Defendants also deny they left the cell in
the disarray Uribe alleges.  McKesson states he does not recall exactly what items he removed from
Uribe's cell, but maintains "only contraband was confiscated" during the "routine search," not any
personal property.  (Dkt No. 81, Exh. B, p. 19, Exh. C, p. 25.)  Defendants rely on a copy of the February
22, 2007 Cell Search Receipt, listing as the confiscated items:  "excess toilet supplies, excess sheets and
pillows, tennis shoes, altered television cable, glue, paper bags, paper clips, and dangerous razors."
(McKesson Decl. Attach. 1, Dkt No. 71-4, p. 6.)  They characterize Uribe's contention the receipt
document is incomplete and "falsified" as "based on pure speculation and conjecture."  (Dkt No. 88:6-8.)

1   However, in their sworn Declarations, Uribe and his cellmate, Fernando Monges, identify specific items

2   of Uribe's personal property taken during the search they contend was not "contraband" or "excess", or

3   was not accounted for on the property receipt.[8]  (Dkt No. 81, 7:17-26.)

4          Uribe's cellmate substantiates Uribe's representations that when they were permitted to return to

5   their cell after about twenty minutes, Uribe's personal tennis shoes and hobby materials were missing.

6   (Dkt No. 83, 3:5-10.) He also declares he saw McKesson "still rummaging through our property" on the

7   way back to the cell. (Id. at 2:21-23.)  "When I walked into the cell I saw most of Uribe's property in

8   shambles; everything was on the floor and it appeared to be stepped on[, w]hile in contrast, my property

9   was only slightly moved but left where it was found." (Id. at 3:2-4.)  In their Reply, Defendants

10  summarily state "[i]n any event, the confiscation and deprivation of Plaintiff's personal property is at

11  most *de minimus*, and certainly not so egregious that a reasonable juror could find that such conduct was

12  clearly adverse to him." (Dkt No. 88, 3:9-11; *see also* Dkt No. 71-2, 7:17-19.)  It appears to the Court

13  that if Uribe proves his allegations, reasonable jurors could find an unwarranted confiscation of a

14  prisoner's permissible personal property constitutes an action "clearly adverse" to the prisoner, however

15  meager the property or "*de minimus*" the deprivation may seem from the vantage point of free persons.

16         Finally, Uribe supports with evidence adequate to avoid summary judgment on the adverse action

17  and injury elements of his retaliation claim allegations that Defendants McKesson and Martinez

18  threatened him with harm in the course of the incidents. *See* Brodheim, 584 F.3d at 1270; *see also*

19  Burgess, 39 F.3d at 218 ("a threat of retaliation is sufficient injury if made in retaliation for an inmate's

20  use of prison grievance procedures").

21              Here, defendant Mc[K]esson threatened plaintiff with falsely charging
                him with attempted escape by threatening to tell the sergeant that plaintiff
22              was attempting to escape from the housing unit when in fact plaintiff was
                trying to exit the housing unit, with defendant Tuzon's knowledge, to
23              report their actions to the sergeant.  Uribe Decl. ¶ 9; Quiroz Decl. ¶ 8.
                Defendant Martinez also threatened plaintiff with additional punitive cell

24

25  ─────────────────

26      [8]  "However, this receipt fails to show plaintiff's hobby materials, e.g. color pencils, color markers, and
    pastels, and his personal T-shirts and socks that Mc[K]esson also took that were not contraband.  Uribe Decl.
27  ¶ 13; Monges Decl. ¶ 8.  And although it does show that plaintiff's tennis shoes and dominoes set were taken,
    it falsely claims they were contraband but fails to clearly state why or that the items were in fact plaintiff's
28  authorized personal property, i.e. not state-issued or altered property and were not contraband.  Uribe Decl. ¶ 13;
    Monges Decl. ¶ 8; and DUF, Mc[K]esson Decl. at attachment 1."  (Dkt No. 79, 22:9-19.)

1

> searches if plaintiff continued or persisted in wanting to sent out legal
> mail to the courts.  Uribe Decl. ¶ 11; Monges Decl. ¶ 5.  As such,
> defendants' claims that plaintiff did not suffer any adverse action should
> be rejected.

2

3

(Dkt No. 79, 23:13-20; Dkt No. 81, ¶ 9.)

4

5        The cell search and property confiscation immediately followed.  Uribe offers the Declaration

6  of inmate Solano, who watched the events giving rise to this action and decided thereafter not to send

7  out some legal mail he had intended to submit, to show "a person of ordinary firmness other than himself

8  was chilled by defendants' conduct against plaintiff."  (Dkt No. 79, 27:18-22; Solano Decl. ¶ 10.)

9        Defendants summarily contend, again without regard to Uribe's proffered evidence, "[b]ecause

10  Plaintiff has failed to demonstrate a triable issue of fact on the essential element of harm, the absence

11  of adverse actions results in a failure to establish an essential element of his case–that the exercise of

12  his constitutional right was actually chilled or that he suffered more that minimal harm–summary

13  judgment is appropriate."  (Dkt No. 71-2, 8:23-26.)  The Court finds Uribe has produced sufficient

14  evidence to preclude summary adjudication of the "adverse action" element of his First Amendment

15  retaliation claim.  The Court similarly finds a reasonable fact-finder could conclude the threat of future

16  cell searches and property confiscations should the inmate pursue legal filings or seek to complain to

17  supervising officers about Defendants' obstructionism would chill or silence a person of ordinary

18  firmness from pursuing those First Amendment activities, precluding summary adjudication of the injury

19  element as well.

### c.    Motivation Element

20

21        Uribe has the burden to show the exercise of his First Amendment rights was the "substantial"

22  or "motivating" factor behind Defendants' alleged misconduct in assaulting him, conducting an allegedly

23  retaliatory cell search, and allegedly confiscating and destroying his personal property.  Rhodes, 408 F.3d

24  at 567-68; Brodheim, 548 F.3d at 1271; *see* Hartman v. Moore, 547 U.S. 250, 259 (2006)(a Section 1983

25  plaintiff "must show a causal connection between a Defendant's retaliatory animus and subsequent injury

26  in any sort of retaliatory action"); *see also* Pratt, 65 F.3d at 807.

27        Defendants argue Uribe's retaliation claims "must be dismissed because he has not alleged any

28  facts that would suggest a nexus between his First Amendment activity and the alleged retaliatory actions

1  of Defendants Martinez, McKesson, Tuzon and Zaragoza." (Dkt No. 71-2, 8:4-6.) "While their acts

2  may have followed Plaintiff's First Amendment activity," retaliation "is not established by showing

3  adverse activity by Defendants after Plaintiff's protected activity." (Id. at 7:27-28, 8:6-7, (citing Huskey

4  v. San Jose, 204 F.3d 893, 899 (9th Cir. 2000)(retaliation claim cannot rest on "the logical fallacy of *post*

5  *hoc, ergo propter hoc*)).) They contend Uribe "only speculates that a retaliatory motive drove their

6  behavior," a premise that is "insufficient as a matter of law." (Id. at 8:6-8.)

7         However, in order to preserve a right to trial on this element of a retaliation claim, a plaintiff

8  need only "put forth evidence of retaliatory motive, that, taken in the light most favorable to him,

9  presents a genuine issue" as to the legitimacy of Defendants' intent. Brodheim, 584 F.3d at 1271 (citing

10 Bruce, 351 F.3d 1289). Without expressing any opinion on the ultimate merits, the Court finds Uribe's

11 Declaration in opposition to the Motion and the Declarations of three fellow prisoners who represent

12 they were percipient witnesses to material portions of Defendants' allegedly retaliatory conduct, the

13 contents of which are discussed above, satisfy the showing required to avoid summary judgment. Uribe

14 also quotes statements purportedly made by Martinez and McKesson from which, if believed, a

15 reasonable trier of fact could infer the decisions to search Uribe's cell, to confiscate his property, and the

16 foot jamming incident were motivated by retaliation for Uribe's persistence in attempting to file legal

17 papers and for his attempt to report Defendants' alleged obstructionist conduct to their supervising

18 sergeant. (Dkt Nos. 81-84.)

19        All the conduct giving rise to Uribe's First Amendment cause of action occurred at about 3:00

20 p.m. and sometime within the 7:00 p.m. hour on February 22, 2007. It is undisputed Defendants

21 accepted Uribe's legal mail "[o]nly after defendant J. Mc[K]esson was told by defendant Tuzon that

22 plaintiff was attempting to exit the housing unit to personally report their misconduct – another protected

23 activity–to their supervisor, the sergeant, did defendant J. Mc[K]esson decide to take plaintiff's legal

24 mail and sign it. . . ." (Dkt No. 79, 24:25-28.) From that fact, Uribe argues they "in turn decided to

25 punish plaintiff for his persistence in wanting to get his legal mail signed." (Id. at 24:28-25:1.)

26 "[T]iming can properly be considered as circumstantial evidence of retaliatory intent." Pratt, 65 F.3d

27 at 808; *see also* Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1316 (9th Cir. 1989)(certain types of

28 circumstantial evidence, such as the timing of events, may be probative of whether defendants acted with

retaliatory intent).  Uribe represents: "All three defendants immediately followed plaintiff to his cell and proceeded to ransack it, illegally confiscate plaintiff's authorized personal property, and left his cell in shambles" (Dkt No. 79, 25:1-3), supported by his Declaration and that of his cellmate.  His cell was searched by "at least two correctional officers and with partial assistance by a third for approximately twenty minutes, as opposed to a routine cell search done by one officer per cell for an average of a five-minute search." (Id. at 25:8-11; see Uribe Decl. ¶ 9; Solano Decl. ¶ 7; Quiroz Decl. ¶ 10; Monges Decl. ¶ 7.)

Uribe produces additional evidence to support the causal connection element of his retaliation claim, contrary to Defendants' representations, in the form of his witnesses' sworn statements that "Mc[K]esson specifically told [Monges] that he was searching their cell because plaintiff insisted that he sign and process his legal mail," that "Martinez also admitted that the punitive cell search was done . . . because [Uribe] wanted to get his legal mail signed and processed . . . [and] that the cell search is what happens to inmates like plaintiff who exercise their right to access the courts," going "so far as to threaten plaintiff with additional punitive cell searches if plaintiff continued to request that his legal mail be signed by them." (Dkt No. 79, 26:8-25 (citing Monges. Decl. ¶¶ 5-6, Solano Decl. 8, Uribe Decl. ¶ 11).)  Uribe also argues reasonable inferences of retaliatory motive may be drawn from the evidence most of the property searched, thrown on the floor, and stepped on was his, with his cellmate's property being barely disturbed. (Dkt No. 79, 20:17-23;  see Uribe Decl. ¶ 12; Monges Decl. ¶¶ 6-7.)  The Court concludes Uribe has carried his burden to raise triable issues of material fact on the motivation element of his retaliation claim.

### d.    Legitimate Penological Goal Element

"The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." Pratt, 65 F.3d at 806 (citing, inter alia, Rizzo, 778 F.2d at 532); see Bruce, 351 F.3d at 1288.  Defendants again urge the Court to leap to an ultimate adjudicative conclusion, inappropriate for this proceeding, and to grant summary judgment in their favor on the ground "Plaintiff has failed to establish an essential element of his case–the absence of any legitimate correctional goals–"for the cell search and deprivation of Uribe's personal property. (Dkt No. 71-2, 9:24-27.)  However, it is sufficient to avoid summary judgment for the plaintiff to produce evidence creating

E.D. California 1:08cv1285-DMS(NLS)

a triable issue of material fact on this element.  Without deciding the merits of Uribe's First Amendment retaliation claim, the Court finds its review of the evidence discussed above in connection with the other essential elements forecloses summary adjudication of this element, as well.  Uribe has carried his evidentiary burden to create a genuine issue as to whether Defendants' alleged conduct was undertaken in furtherance of legitimate penological objectives.  For all the foregoing reasons, Defendants' Motion on this claim is **DENIED**.

### F.     Dismissal Of Defendants Martinez and Tuzon

Defendants argue "Officers Martinez and Tuzon are entitled to summary judgment because they did not personally participate in part or all of the allegedly retaliatory conduct of February 22, 2007." (Dkt No. 71-2 (emphasis removed).)

Defendant Martinez is the officer Uribe alleges slammed the office door on his foot.  Uribe declares:

> I heard J. Mc[K]esson tell J. Martinez to "slam the door on this stupid motherfucker [plaintiff]!"  With my peripheral vision I saw the door thrown at me by J. Martinez – who was sitting behind the opened door – and I did get scared and shocked and reflexively cringed and jumped back but in the process my right foot was smashed between the door and door way.   I did experience sudden stabbing pain on my right toe and toe knuckle behind the toe for several minutes and as I grimaced and pulled by foot out, J. Martinez fully closed the door . . . I was not only injured, but was also offended by having the door slammed in my face and hitting my foot instead.  I respectfully requested that my legal mail be signed and sent out and then left and returned according to their instructions only to be met with hostility, profanity, contempt, intimidation and the injury to my person.

(Uribe Decl., Dkt No. 81, ¶¶ 6-7.)

As that entire incident is disputed, and the Parties have produced conflicting evidence to support their divergent versions of events, the dismissal of Defendant Martinez would not be appropriate in this proceeding.  In addition, it is undisputed Martinez accompanied Defendants McKesson and Zaragosa when they followed Uribe back to his cell.  While Martinez may not have physically entered Uribe's cell or participated hands-on in the confiscation of his personal property, Uribe has produced sufficient evidence that Martinez was present during the cell search, observed some portions of it, and may on that basis be found to have participated personally in facilitating the search Uribe challenges as a retaliatory adverse action.  Furthermore, the Uribe, Monges, and Solano Declarations also substantiate Uribe's

1  allegations that Defendant Martinez "threatened plaintiff with additional punitive cell searches if plaintiff

2  continued with requests to have his legal mail signed and sent out." (Dkt No. 79, 32:26-18; Uribe Decl.

3  ¶ 11; Monges Decl. ¶¶ 5-6; Solano Decl. ¶ 8.)  The Court concludes summary judgment for Defendant

4  Martinez accordingly must be **DENIED**.

5       Officer Tuzon declares:  "I did not personally participate in the alleged assault and battery, the

6  cell search, or the confiscation and destruction of Plaintiff's personal property." (Dkt No. 71-7, ¶ 9.)

7  Uribe's Declaration substantiates that Tuzon's only involvement in the conduct giving rise to this action

8  was to tell him to "go lock up" when he was attempting "to step out of the building to go talk to the

9  sergeant to get my legal mail signed because the floor officers were refusing to do it," to "close the grill

10  gate so I could not go speak to the sargeant," to tell "the other defendants of my attempt to exit the

11  housing unit to talk to the sergeant–their supervisor," and then to "open[] our cell door so the defendants

12  could search the cell." (Dkt No. 81, ¶¶ 8, 11.)

13       In his verified responses to Uribe's Interrogatories, Tuzon states, not inconsistently with Uribe's

14  version of the events, he opened Uribe's cell following the evening meal on February 22, 2007 because

15  the facility was not on lockdown, Uribe told him he had legal mail, and Defendant Tuzon told him to

16  go ahead and walk to the facility office. (Dkt No. 81, Exh. I, pp. 84-85.)  Thereafter, Uribe went back

17  to his cell, changed into his dress blues, and wanted to leave his cell to go see the sergeant to ask him

18  to process his legal mail because the floor officers would not do it.  While it is permissible for inmates

19  to report staff misconduct verbally to other correctional staff in addition to using the CDC 602 appeal

20  process (id. at p. 88), Tuzon told Uribe the sergeant was not going to process his legal mail because it

21  was not his job, and that the floor officers would process his legal mail during their shift.  "Shortly

22  thereafter, one of the floor officers called plaintiff back into the E2 office to process his mail." (Id. at

23  pp. 85-87.) Tuzon's report to the floor officers must be reasonably construed as causing, not obstructing,

24  the ultimate acceptance of Uribe's legal mail as he desired, albeit allegedly not without further

25  intimidation and threats from the others, as discussed above.

26       Uribe has the burden to "set forth specific facts as to each individual defendant's" causal role in

27  the alleged constitutional violation.  See Johnson, 588 F.2d at 743.  The evidentiary record demonstrates

28  that Tuzon's involvement  in the alleged interference with a protected activity was limited to ordering

Uribe back to his cell when he attempted to leave the housing unit and then reporting to the floor officers that Uribe had attempted to leave the housing unit for the purpose of talking to the sergeant about their refusal to accept his legal papers.  The totality of Tuzon's participation in the cell search incident was to open the cell when the other officers asked him to do so.  Uribe does not contend he had authorization to "step out of the building" to follow the group of inmates released to attend a particular group meeting when Officer Tuzon sent him back to his cell.  He imputes the motive for Defendant Tuzon's calling him back, supported only by speculation, was that he sought to prevent Uribe from speaking to the sergeant in an effort to interfere with his rights to court access and to report other officers' violations of his rights. "Sweeping conclusory allegations will not suffice to prevent summary judgment." Leer, 844 F.2d at 634. Uribe also alleges "defendant Tuzon knew of the other defendants' conduct and failed to act to prevent them and instead aided and abetted them and is therefore also liable for plaintiff's injuries" (Dkt No. 79, 30:25-27), and also argues by closing the grill gate and preventing him from "utilizing another opportunity to get his legal mails signed and by ordering plaintiff to go back to his cell and lock it up," Defendant Tuzon was "aiding defendants' conduct" (Id. at 31:11-13).  However, his summary contentions do not provide any evidentiary support for a finding Defendant Tuzon personally participated in a constitutional violation, as required for Section 1983 liability.  Tuzon remained in the control booth, over forty feet away from where Uribe and his cellmate were confined, while other of the Defendants searched their cell, he did not witness the search itself, and he did not see Defendant Martinez talking to Uribe or overhear what was said while he and his cellmate were in the shower holding cell.  (Dkt No. 81, Exh. I, p. 88.)

The Court finds no evidence to support Uribe's claim Officer Tuzon personally participated in the alleged assault with the office door or the cell search and property confiscation conduct.  The Court further finds no evidentiary basis for any reasonable inference Tuzon apprised the other correctional officers on duty of Uribe's movements and intentions for an improper purpose.  There is no evidence he had any personal involvement in obstructing or chilling Uribe's access to the courts, and his refusal to allow Uribe to leave the facility that night in the circumstances described cannot support a reasonable finding the decision lacked a legitimate correctional goal.  The Court finds no evidence to support Uribe's claim Tuzon was personally involved in the alleged retaliatory acts in any manner that could

satisfy all the elements of a First Amendment retaliation cause of action against him. *See* <u>Rhodes</u>, 408 F.3d at 567-68. Accordingly, Defendant Tuzon is **<u>GRANTED</u>** summary judgment in his favor.

**III.     CONCLUSION AND ORDER**

For all the foregoing reasons, **IT IS HEREBY ORDERED**:

1.     Summary judgment is **<u>GRANTED</u>** as to Defendant Tuzon, and he is **<u>DISMISSED</u>** as a party to this action.

2.     Defendants' Motion for dismissal of the pendant state law claims is **<u>GRANTED</u>** as a matter of law on grounds those are barred by the six-month statute of limitation for initiating a lawsuit following the State's rejection of the tort claims against these public employees pursuant to California Government Code § 945.6(a)(1).

3.     Defendants' Motion For Summary Judgment on the First Amendment claim is **<u>DENIED</u>** as to Defendants McKesson, Martinez, and Zaragosa.

**IT IS SO ORDERED.**

DATED:  January 3, 2011

_____
HON. DANA M. SABRAW
United States District Judge